UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Michael Scott Hanuman,

        Defendant.

Case No. 18-cr-112 (ADM/SER)

REPORT AND
RECOMMENDATION

Benjamin Bejar, Esq., United States Attorney's Office, Minneapolis, Minnesota, for Plaintiff.

Douglas L. Micko, Esq., Office of the Federal Defender, Minneapolis, Minnesota, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case came before the undersigned on Defendant Michael Scott Hanuman's ("Hanuman") Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion to Suppress Evidence") [Doc. No. 24] and Motion to Suppress Statements, Admissions, and Answers ("Motion to Suppress Statements") [Doc. No. 25]. This matter was referred for the resolution of the issues raised in Hanuman's Motions to Suppress pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends the Motions to Suppress be denied.

**I.    BACKGROUND**

On May 16, 2018, the United States of America (the "Government") filed an indictment charging Hanuman with possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871, being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), possession with intent to distribute methamphetamine in violation of 21 U.S.C.

§§ 841(a)(1) and 841(b)(1)(B), and possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). (Indictment) [Doc. No. 1].

The Court held an evidentiary hearing on July 9, 2018. (Minute Entry Dated July 9, 2018) [Doc. No. 29]. Dakota County Sheriff's Office Deputy James O'Meara ("Deputy O'Meara") and Dakota County Sheriff's Office Deputy Timothy Fletcher ("Deputy Fletcher") testified, and the Court received seventeen exhibits into evidence. (Ex. & Witness List) [Doc. No. 30]. During the hearing, the parties agreed that the Motion to Suppress Statements is moot. (Tr. of Evidentiary Hr'g, "Tr.") [Doc. No. 35 at 4]. The parties submitted supplemental briefing regarding the Motion to Suppress Evidence. (Gov't's Mem. in Opp'n to Def.'s Mot. to Suppress) [Doc. No. 38]; (Mem. of Law in Supp. of Mot. to Suppress, "Hanuman's Mem. in Supp.") [Doc. No. 39]; (Gov't's Reply to Def.'s Mem. in Supp. of Mot. to Suppress) [Doc. No. 40].

## II.   FACTS

As stated above, Deputy O'Meara and Deputy Fletcher are deputies with the Dakota County Sheriff's Office (Tr. at 7, 54). Deputy Fletcher previously worked with the Drug Enforcement Agency ("DEA") task force and is certified as a clandestine drug examiner. (*Id.* at 55). During his DEA tenure, Deputy Fletcher participated in searches of residences for narcotics. (*Id.* at 56).

On January 6, 2018, Deputy O'Meara, Deputy Fletcher, and several other deputies responded to a "check welfare call" for Hanuman, who was described as "messed up." (*Id.* at 9–10, 57). Dispatch advised the deputies that Hanuman was on probation following his conviction of being a felon in possession of a firearm. (*Id.* at 10–11). Deputies were also aware that Hanuman had a history of drug use. (*Id.* at 11); *see also* (*id.* at 58). After an unsuccessful attempt to contact Hanuman by phone, Deputy O'Meara drove to Hanuman's residence in Hampton, Minnesota,

while other officers searched for Hanuman in other locations in Hampton. (*Id.* at 9, 12–14). Deputy O'Meara drove around the residence to determine whether anyone was home and observed some lights on. (*Id.* at 14). Deputy O'Meara then parked his squad car and was joined by Deputy Johnson. (*Id.* at 14–15). After learning the other deputies were unable to locate to locate Hanuman, Deputy O'Meara and Deputy Johnson then knocked on the outer front door of Hanuman's residence. (*Id.* at 15–16). At this point, Deputy Fletcher had also arrived at Hanuman's residence and was waiting in his squad car. (*Id.* at 59).

After his first knock, Deputy O'Meara heard a faint yell. (*Id.* at 17). After knocking again, he heard a female voice screaming for help. (*Id.*); *see also* (*id.* at 60). Deputy O'Meara asked the woman to come to the door, but could not communicate with her. (*Id.* at 17–18). Deputy Fletcher took his ram in anticipation of a forced entry, instructed Deputy Johnson to get his rifle, and instructed Deputy Jaskowiak to get her "less lethal shock gun." (*Id.* at 60). The three deputies approached the door, as did Deputy Klug. (*Id.* at 18). Deputy O'Meara and Deputy Fletcher received permission to breach the door, and Deputy O'Meara kicked in the glass door. (*Id.* at 18–19, 62–63). Then Deputy O'Meara stepped aside, and Deputy Fletcher breached the door with a ram. (*Id.* at 19). At this point, Deputy Johnson and Deputy Klug were at the back of the house. (*Id.* at 34, 64). Deputy Fletcher, Deputy O'Meara, and Deputy Jaskowiak—whose firearms were drawn—entered the home into a split entry way and saw a motionless woman at the bottom of the stairway. (*Id.* at 21, 64–65). Deputy Joskowiak's body microphone was recording when the deputies entered the home. *See* (Govt's Exs. 1, 1A); (Tr. at 20–21, 60–61). The woman was moaning and yelling in pain. (*Id.* at 21–22, 65); *see* (Gov't's Exs. 2–3) (photographs of the victim lying on the floor). At this point, Deputy Klug joined the others, and the deputies asked the woman if anyone was home. (*Id.* at 23, 65). She told the deputies that Hanuman had hit her and that he

was in the home. (*Id.* at 23, 65–66). Deputy Fletcher radioed to dispatch for medical assistance. (*Id.* at 65). The deputies then searched the residence with their guns drawn to look for Hanuman. (*Id.* at 24, 66).

Deputy O'Meara and Deputy Fletcher went up the stairs, while Deputy Jaskowiak and Deputy Klug searched the garage. (*Id.* at 27, 66). Deputy O'Meara heard Deputy Jaskowiak and Deputy Klug giving verbal commands suggesting that they had found someone. (*Id.* at 27–28); *see also* (*id.* at 66–67). Deputy O'Meara then radioed to dispatch that the other deputies had found someone. (*Id.* at 28). He and Deputy Fletcher went to the garage to assist. (*Id.*). Deputy O'Meara observed Deputy Jaskowiak and Deputy Klug holding a man—later identified as Hanuman—at gunpoint near the front of the driver's side of the sedan in the garage. (*Id.*). The deputies told Hanuman not to move and to keep his hands up. (*Id.* at 29–30). Hanuman lowered his hands and the deputies raised their voices to tell him to keep his hands up and arrested him. (*Id.* at 30, 69). Deputy O'Meara asked Hanuman twice if anyone was home, but Hanuman did not respond. (*Id.* at 30); *see also* (*id.* at 92–93). After Hanuman was arrested and put into the back of a squad car, Deputy O'Meara, Deputy Jaskowiak, and Deputy Fletcher went back into the home to search the rest of the residence to see if anyone else was inside. (*Id.* at 30–31, 69). Deputy O'Meara stated that the purpose of the search was to make sure the scene was safe, to treat the victim, to see who was inside, and to make sure "there's no unknowns." (*Id.* at 30–31). Deputy Fletcher testified that the protective sweep was necessary to protect the safety of himself, the other deputies, the victim, and the paramedics. (*Id.* at 69–70). Deputy Fletcher testified that protective sweeps are limited to places where a person can be, including in closets, underneath beds, and in various rooms in the house. (*Id.* at 70).

Deputy Fletcher and Deputy O'Meara began the protective sweep by looking in the living room and kitchen. (*Id.* at 70). In the kitchen, Deputy Fletcher noticed a digital scale, tear-offs, and baggies on the center island of the kitchen.[1] (*Id.* at 71); *see* (Gov't's Exs. 8–10). Deputy Fletcher also found a torch and propane tank on the staircase, which he believed to be used to heat methamphetamine, heroin, or another controlled substance. (Tr. at 71–72); *see* (Gov't's Ex. 4). In the corner of the upstairs bedroom, Deputy Fletcher saw a black safe. (Tr. at 74); *see also* (Gov't's Exs. 11–12). Deputy Fletcher also saw a large amount of Ziploc bags, which he knows to be commonly used for controlled-substance distribution, and a Gatorade bottle that "had been fashioned into some sort of methamphetamine pipe." (Tr. at 74–75); *see* (Gov't's Exs. 13–14). After the protective sweep of the upper level was completed, Deputy Fletcher, Deputy O'Meara, and Deputy Jaskowiak did a sweep of the lower level. (Tr. at 76). Deputy Fletcher instructed Deputy Johnson and Deputy Klug to place Hanuman into a squad car. (*Id.* at 76–77). Deputy Fletcher was informed that a large amount of U.S. currency had been found on Hanuman. (*Id.* at 79). Deputy Fletcher then radioed to dispatch that the scene was safe and that the medics were clear to enter the scene. (*Id.* at 77). The deputies began treating the victim, and Deputy Fletcher assisted the medics when they arrived on the scene. (*Id.* at 33–33, 78).

Deputy Fletcher remained on the scene and waited for the authorization of a search warrant. (*Id.* at 78). The search warrant was based on the items the deputies had seen in plain view during their protective sweep, as well as the assault allegation. (*Id.*). After the search warrant was obtained, Deputy Fletcher searched the residence and found a .357 handgun and more than 100 grams of methamphetamine in Hanuman's car. (*Id.* at 88–89).

---

[1] Deputy Fletcher defined a tear-off as the corner of a Ziploc bag that is ripped off from the rest of the bag and used to store drugs by tying the end off. (Tr. at 73).

Hanuman argues that the deputies' protective sweep was not justified and therefore violated the Fourth Amendment. *See* (Hanuman's Mem. in Supp. at 5). Correspondingly, Hanuman argues the evidence seized pursuant to the search warrant—which was based on items viewed during the protective sweep—should "be suppressed as fruit from a poisonous tree." (*Id.*).

### III.  DISCUSSION

#### A.  Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

One of these exceptions is a protective sweep—"a quick and limited search of premises . . . narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). In a situation where a suspect is or recently was arrested, law enforcement officers may need to ensure that the suspect "is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* at 333. This risk is higher in case of an arrest—compared to a traffic stop—for two reasons. First, an arrest is a "serious step of taking a person into custody for the purpose of prosecuting him for a crime." *Id.* In a traffic stop, the "police-citizen confrontation" has not yet "escalated to the point of arrest." *Id.* Second, "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.*

6

In order to conduct such a protective sweep, "there must be articulable facts which, taken together with the rational interferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334.

### B.   Analysis

The Court concludes that at the time of the protective sweep, the deputies had specific, articulable facts that suggested that there may be an unidentified individual in the residence and the protective sweep was lawful.

As an initial matter, the Court notes that arresting and removing a defendant is not dispositive of the lawfulness of a protective sweep. *See United States v. Waters*, 883 F.3d 1022, 1026 (8th Cir. 2018) (per curiam) (citing *United States v. Alatorre*, 863 F.3d 810, 814 (8th Cir. 2017); *United States v. Boyd*, 180 F.3d 967, 975–76 (8th Cir. 1999)); *see also Buie*, 494 U.S. at 334 ("[A]rresting officers are permitted in [certain] circumstances to take reasonable steps to ensure their safety after, and while making, the arrest."). The Eighth Circuit has found protective sweeps lawful in circumstances similar to this case. In one case, a protective sweep was lawful when there were areas of the residence that were not visible to officers. *See Alatorre*, 863 F.3d at 813–15. When officers approached the house, they "saw movements in the residence consistent with multiple people inside." *Id.* at 812. The officers conducted a protective sweep after the defendant was arrested and removed from the residence and after his girlfriend left the residence and said no one else was inside. *Id.* The Eighth Circuit concluded that officers "dealing with [defendant] and his girlfriend were vulnerable to attack from someone inside the residence." *Id.* at 815.

In another case, law enforcement officers knew that the defendant "was on parole for possession of narcotics with intent to distribute and possession of a machine gun." *Boyd*, 180 F.3d at 975. They secured all the occupants of the house, handcuffed the defendant, and moved him to another area of the residence before conducting a protective sweep. *Id.* The Eighth Circuit concluded the protective sweep was lawful because the search was "quick and limited" and "confined to places large enough to conceal a person." *Id.* at 976 (internal quotation marks omitted).

Here, Hanuman had been arrested at the time of the protective sweep. (Tr. at 30–31, 69). The woman in the home had only identified one other person—Hanuman—as being in the residence. (*Id.* at 23, 65). Hanuman, however, when asked if anyone else was in the home, refused to answer. (*Id.* at 30, 92–93). The deputies were aware that Hanuman was on probation for being a felon in possession of a firearm and had been arrested in the past for controlled-substance related offenses. (*Id.* at 10–11, 58). The Court concludes that these facts are sufficient for the deputies to reasonably conclude that the residence may have contained an individual posing a danger to the deputies at the scene.[2] *See Buie*, 494 U.S. at 334; *United States v. Williams*, 577 F.3d 878, 881 (8th Cir. 2009) ("While hindsight reveals that the officers had already encountered all of the occupants of the home before conducting the protective sweep, that information was not apparent to the officers when they initiated the sweep."). Therefore, the Court concludes the protective sweep was lawful. Correspondingly, the items in plain view during the protective sweep were

---

[2]     Hanuman speculates that the true reason for the protective sweep was because officers felt entitled to do it. (Hanuman's Mem. in Supp. at 1, 8–9). Hanuman argues this is so because when Hanuman asked why officers were searching his home, Deputy Fletcher responded, "because we can." (*Id.*); (Tr. at 80–81). But this Court must rely on what facts the deputy knew at the time of their sweep, not statements they made afterwards. *See Buie*, 494 U.S. at 334.

8

properly included in the search warrant application, and suppression of the evidence obtained from the execution of the search warrant is not warranted.

## IV. RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that

1. Defendant Michael Scott Hanuman's ("Hanuman") Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 24] be **DENIED**; and

2. Hanuman's Motion to Suppress Statements, Admissions, and Answers [Doc. No. 25] be **DENIED** as moot.

Dated: September 18, 2018

*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

**Notice**

Filing Objections: This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).