# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Michael Scott Hanuman,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
Criminal No. 18-112 ADM/SER

_____

Benjamin Bejar, Assistant United States Attorney, United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff.

Douglas L. Micko, Assistant Public Defender, Office of the Federal Defender, Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for consideration of Defendant Michael Scott Hanuman's ("Hanuman") Objection [Docket No. 44] to Magistrate Judge Steven E. Rau's September 18, 2018 Report and Recommendation ("R&R") [Docket No. 43]. In the R&R, Judge Rau recommends denying Hanuman's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion to Suppress Evidence") [Docket No. 24] and Hanuman's Motion to Suppress Statements, Admissions, and Answers ("Motion to Suppress Statements") [Docket No. 25]. Hanuman objects to the R&R.[1] Based on a de novo review of the record, Hanuman's Objection is overruled, the R&R is adopted, and Hanuman's Motions are denied.

---

[1] During the July 9, 2018 evidentiary hearing on Hanuman's Motions, the parties agreed that the Motion to Suppress Statements is moot. Hr'g Tr. [Docket No. 35] at 4. Hanuman does not object to the recommended denial of the Motion to Suppress Statements.

## II. BACKGROUND

The factual background of this case is set forth in the R&R and is incorporated by reference. To directly address the Objection, some facts of record not discussed in the R&R are relevant. Briefly, around midnight on January 6, 2018, five Dakota County Sheriff's Deputies responded to a 911 "check welfare" call for Defendant Hanuman. Hr'g Tr. at 8–9, 57. An unidentified female had called dispatch to report that Hanuman was in the downtown area of Hampton, Minnesota and had phoned her multiple times saying he was "messed up" and needed help. Id. at 9–10, 57–58. There was a concern that Hanuman was intoxicated and wandering outside in the frigid weather. Id. at 12–13.

The computer-aided dispatch system generated an alert for Hanuman and his home address in Hampton. Id. at 10–11, 58–59. The alert warned that Hanuman was on probation for being a felon in possession of a firearm, and that he had multiple cameras around his house. Id. at 10–11, 58–59. The deputies were also aware that Hanuman had previous arrests for drug-related offenses. Id. at 11, 58. The deputies had no information whether anyone else lived at Hanuman's house. Id. at 34.

Two of the deputies drove directly to Hanuman's home while the other three searched for him in Hampton. Id. at 12–15. The three deputies searching in Hampton did not locate Hanuman so proceeded to his house. Id. at 15–16, 59.

One of the deputies who drove directly to Hanuman's home observed some lights on in the house, but the windows in the door of the attached garage were dark. Id. at 14, 16. The deputy shined his flashlight into the garage and saw a sedan and some miscellaneous garage-related items, but nothing further. Id. at 16.

The deputy then approached the house and knocked on the front door. Id. at 16–17. Shortly after knocking, he heard a faint yell followed by a female voice screaming for help. Id. at 17. The officer asked the woman if she could come to the door, but she did not do so and continued to scream in pain. Id. at 17–18, 62–63. Three additional deputies came to the door to assist in forcing it open with a ram. Id. at 18–19, 63.

The door opened to a split entryway, and the officers saw a woman laying motionless at the bottom of the stairs. Id. at 21, 64–65. The woman was moaning and yelling in pain and appeared to be having difficulty breathing. Id. at 22, 65. She told the deputies that "Mike" had hit her in the head. Id. at 23, 65. When asked whether anyone else was home, the woman responded that "Mike" was there. Id. at 23, 65.

The deputies radioed dispatch to request an ambulance and asked that the ambulance "stage" (i.e., not come onto the scene) until the scene was safe. Id. at 65, 67. The deputies then shouted to announce their presence and to ask Mike where he was. Id. at 66. When no one responded, the deputies began a sweep of the home with their guns drawn to look for Mike and anyone else who might be in the home or might be injured. Id. at 24, 66.

As two of the deputies were ascending the staircase to the kitchen and living room, they heard two other deputies shouting commands to a man (later identified as Hanuman) who was found hiding behind the a car in the dark garage. Id. at 27–29, 66–67. The deputies on the staircase turned around before reaching the top of the stairs and went down to the garage to assist. Id. at 28, 37–38, 66, 68. Hanuman was handcuffed in the garage and placed under arrest. Id. at 30, 69. The deputies twice asked Hanuman if anyone else was in the house, but he did not respond. Id. at 30, 92–93.

After Hanuman was arrested, three deputies went back into the house and performed a protective sweep to look for other possible victims or assailants who might still be in the home. Id. at 30–31, 48, 69–70. The purpose of the search was to ensure the scene was safe for the victim who remained in the home, as well as the deputies who were treating her and the paramedics who were on their way. Id. at 31, 70. The sweep lasted approximately one to three minutes. Id. at 31, 76.

When performing the protective sweep, the officers observed: a digital scale and baggies on the center island of the kitchen; a torch and propane tank on the staircase leading to the kitchen; and a black safe, Ziplock bags, and a Gatorade bottle fashioned into a methamphetamine pipe in an upstairs bedroom. Id. at 71–76. No other individuals were found in the house. Id. at 32.

After the sweep was completed, the deputies radioed dispatch to inform them that the scene was safe and the paramedics were clear to enter. Id. at 77. While awaiting the paramedics, two deputies remained in the house to provide the victim with medical attention that included administering oxygen. Id. at 32. After the paramedics' arrival, the victim was carried out of the house on a backboard to an ambulance. Id. at 78.

The deputies then applied for and obtained a search warrant for Hanuman's house and car. Id. at 78, 89–90. The search warrant was based on the items the deputies had seen in plain view during the protective sweep, the assault, and a large amount of cash that was found on Hanuman when he was arrested. Id. at 78–79. When law enforcement searched Hanuman's car they found a .357 handgun and more than 100 grams of methamphetamine. Id. at 89.

On May 16, 2018, a grand jury returned an Indictment [Docket No. 1] charging Hanuman

with: (1) possessing an unregistered firearm; (2) being a felon in possession of a firearm; (3) possession with intent to distribute methamphetamine; and (4) possessing a firearm in furtherance of a drug trafficking crime.

Hanuman moves to suppress the evidence obtained from the warrant-based search. He argues the protective sweep was unjustified and that the search warrant was tainted by information obtained through the sweep. Hanuman contends that the evidence must be suppressed as the fruit of an unconstitutional protective sweep.

## III. DISCUSSION

### A. Standard of Review

In reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. L.R. 72.2(b). A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

### B. Hanuman's Objection

Hanuman argues the protective sweep was unlawful because he had been secured in police control at the time of the search and there were no facts to suggest that a dangerous person remained in the house. Hanuman contends the protective sweep was based solely on the officers' perception that he was dangerous and the absence of information about whether someone else was in the house.

The Fourth Amendment generally prohibits the search of a residence without a warrant issued on probable cause. Maryland v. Buie, 494 U.S. 325, 331 (1990). However, an exception

5

exists for the protective sweep. Id. at 327. "A 'protective sweep' is a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. A protective sweep is justified if it is supported by "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 337. The Eighth Circuit has recognized that a protective sweep is "particularly important during an in-home arrest, due to the heightened potential for an ambush in unfamiliar surroundings." United States v. Alatorre, 863 F.3d 810, 814 (8th Cir. 2017).

Here, the protective sweep of Hanuman's home was justified by articulable facts to support a reasonable belief that someone posing a danger to them could be inside the house. First, the protective sweep was necessary to protect the officers who were tending to the victim and the paramedics arriving on the scene from anyone who may have been in the house. See Buie, 494 U.S. at 334 (stating officers are permitted to ensure their safety both "after, and while making, the arrest"); United States v. Ford, 888 F.3d 922, 928 (8th Cir. 2018) ("Justification for a preventive sweep does not automatically end when a suspect is arrested."); Alatorre, 863 F.3d at 815 (holding protective sweep justified because officers who remained on the front porch of a residence to deal with the defendant and his girlfriend "were vulnerable to attack from someone inside the residence"). The officers were justified in ensuring the home was free from danger while they and the paramedics were required to remain in the house. See United States v. Lucas, 898 F.2d 606, 610 (8th Cir. 1990) ("[I]t does not make sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures."). Here, the involvement of the

6

officers with the crime scene did not conclude with Hanuman's arrest because of the need to assist the victim.

Second, during the time it took law enforcement to force their way into the home, Hanuman was able to hide in the garage until he was found. It was reasonable for the police to believe that anyone else inside the home would similarly have had the time and ability to hide from the officers' view, which had been limited to the front entryway and the garage. No officer had reached the top of the stairway to have any view of the upstairs portion of the house. See Alatorre, 863 F.3d at 814–15 (holding protective sweep justified where defendant's girlfriend "lingered in the kitchen out of sight of the officers until she was specifically called to the door, indicating that it was easy for someone to hide just out of view of the officers inside the residence in a position from which an attack could be launched"); United States v. Waters, 883 F.3d 1022, 1026–27 (8th Cir. 2018) (noting that the officers' announcing their presence several times before breaching the door "provided anyone in the residence ample time to hide before officers entered the residence").

Third, the officers knew that Hanuman had multiple cameras surveilling his home, which may have given ample forewarning to others in the house of the officers' arrival sufficient to allow someone to hide within the house. See United States v. Davis, 471 F.3d 938, 945 (8th Cir. 2006) (upholding protective sweep where "surveillance cameras were attached to the [defendant's] house, which could indicate the heightened possibility of a surprise attack").

Fourth, the officers knew that Hanuman had been convicted for being a felon in possession of a firearm, making it was possible that anyone remaining in the house might have access to guns that could be used in an ambush. See Alatorre, 863 F.3d at 815 (noting that

defendant's criminal history involving concealed weapons made it conceivable that others were in the house with access to weapons).

Fifth, the officers' unexpected discovery of the assault victim in Hanuman's home presented a violent and dangerous situation in which the officers were uncertain as to how many other people were inside the house and what the intention of those other persons might be toward the officers.  See United States v. Boyd, 180 F.3d 967, 975–76 (8th Cir. 1999) (holding protective sweep justified because "[w]hen the law enforcement officers entered the house . . . they had no way of knowing how many people were there").  Although the assault victim responded that "Mike" was there and did not name others when she was asked if anyone else was in the house, the officers were not required to assume that no one else was in the home.  See, e.g., Waters, 883 F.3d at 1025 (upholding a protective sweep even though the defendant's fiancee told officers that the defendant was the only person inside the residence).  Moreover, Hanuman refused to respond to officers' questions about whether anyone else was in the house.

Given the existence of articulable facts and inferences to support a reasonable belief that an additional person on the scene could pose a danger to them, the protective sweep of the house was constitutional.  "[T]hough hindsight reveals that the officers had already encountered the only two individuals present in [the defendant's] residence, the . . . officers were justified in conducting the protective sweep." Alatorre, 863 F.3d at 815.

### IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Hanuman's Objection to Report and Recommendation [Docket No. 44] is **OVERRULED**;

2. The Report and Recommendation [Docket No. 43] is **ADOPTED**;

3. Hanuman's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 24] is **DENIED**; and

4. Hanuman's Motion to Suppress Statements, Admissions, and Answers [Docket No. 25] is **DENIED**.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: November 15, 2018.